Filed 9/27/13  In re D.K. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re D.K., a Person Coming Under the Juvenile Court Law. | B246245 (Los Angeles County Super. Ct. No. CK89643) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DESMOND K.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jessica S. Mitchell, Senior Associate County Counsel, for Plaintiff and Appellant.

————————————

A presumed father, whose whereabouts remained unknown until shortly before the reunification services ended, contends that respondent Department of Children and Family Services (DCFS) shirked its duty to continue diligently to search for him, and that the juvenile court erred in failing sua sponte to appoint counsel to represent him. We find DCFS failed in its duty to diligently search for father, but that father was not prejudiced thereby. We also find the court had no obligation to appoint counsel for father, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 4, 2011, DCFS responded to a referral alleging general neglect of D.K. and his half-sister A.H. by the children's mother.[1] DCFS learned that mother, who had given birth to D.K. that day, had a positive toxicology finding for methamphetamine, and had not obtained prenatal care during her pregnancy. Mother admitted having smoked marijuana, into which an ex-boyfriend had put methamphetamine without her knowledge. D.K. had a positive toxicology screen for marijuana and methamphetamine at the time of his birth.

Mother admitted smoking marijuana "a few times" during her pregnancy, most recently a few days before D.K.'s birth, but denied using methamphetamines or any other drugs or alcohol. Mother had no permanent housing, and was staying with friends. She identified appellant Desmond K. (father) as the newborn's father. The social worker explained that the family would be offered voluntary family reunification (VFR) services unless mother disagreed, in which case the matter would go to juvenile court and the family would get reunification services.

Father denied any drug or alcohol abuse and agreed to submit to drug testing. Father admitted having been arrested in July 2011 for domestic violence against mother, as to which he pleaded no contest and was required to take domestic violence classes. There was a restraining order against father, by which both parents admitted they had not

---

[1] A.H. is not a subject of, and mother is not a party to this appeal. The facts are tailored accordingly.

abided. Father's August 16 drug test was positive for marijuana, amphetamine and methamphetamine.

The parents agreed to enter into a VFR contract with DCFS, whereby they would voluntarily place D.K. in foster care and each enroll in a drug treatment programs. Both children were placed in foster care with Ms. H.

On August 23, 2011, the social worker tried to contact father by phone at the only number he had given DCFS. Someone answered but hung up, and the next call went directly to voicemail; the social worker left father a message.

On August 24, 2011, a social worker took mother to a McDonald's restaurant to visit the children. Father was there when they arrived. Father told the social worker he agreed with the VFR contract. The social worker reminded the parents to enroll in drug treatment programs, and said the restraining order disallowed them from visiting the children together.

On September 2, 2011, DCFS spoke with a woman at the house at which father had been staying. She told DCFS father had been kicked out two weeks earlier. That same day DCFS tried to contact father through D.K.'s paternal grandmother, and left a telephonic message.

The parents did not show up for a scheduled Team Decision Making (TDM) meeting on September 7, 2011 to discuss D.K.'s placement. Based on father's positive drug test, the parents' failure to attend the TDM meeting or to maintain contact with DCFS, and the agency's inability to verify the parents' participation in agreed-upon services, DCFS deemed it necessary to place D.K. in protective custody.

On September 12, 2011, DCFS filed a Welfare and Institutions Code[2] section 300 petition alleging that the children were described under section 300, subdivision (b), based on D.K.'s positive toxicology screen at birth, the parents' history of illicit drug use

---

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

3

and their current use of methamphetamine, amphetamine and marijuana. Neither parent attended the detention hearing. The juvenile court detained the children from the parents' custody and ordered monitored visits and "tentative" family reunification services for father, once he contacted DCFS. The court continued the hearing to September 20, 2011, so DCFS could perfect notice as to the parents.

In a September 20, 2011, last minute information, DCFS reported a social worker had spoken to the parents on September 9 on the foster parent's cell phone. The social worker informed the parents about the September 12 detention hearing; they said they would attend. Neither parent had a telephone number at which to be contacted. The social worker told the parents it was extremely important that they maintain contact with DCFS and D.K.'s foster parent, and they promised to do so. The parents failed to show up for a scheduled visit on September 14, 2011.

In its jurisdiction/disposition report dated October 6, 2011, DCFS reported that results for its due diligence search on father were still pending, and his whereabouts remained unknown. Although the results of father's August 16 drug test were positive for amphetamine, methamphetamine and marijuana, he denied using anything but marijuana for which he claimed to have a medical card. D.K. remained placed with Ms. H. DCFS recommended that he be declared a juvenile court dependent and placed outside the parents' care. It also recommended monitored visitation for father, and reunification services, including parenting education, substance abuse treatment with random testing, and individual counseling.

Neither parent appeared for the October 6, 2011 hearing. The court found notice proper, and set the matter for a contested adjudication hearing.

In a November 2, 2011, last minute information, DCFS reported that a September 29 due diligence search request produced 12 possible addresses for father to which DCFS had mailed notice and contact letters. As of November 2, seven responses remained outstanding.

Neither parent attended the November 3 adjudication hearing. The court observed that mother had appeared the day before, filled out a paternity questionnaire and provided

4

a new address for herself. The juvenile court found father to be D.K.'s presumed father, but did not appoint counsel for him. The court noted that mother claimed father was in jail, and ordered DCFS to try to find father and determine whether he remained in custody. On November 14, DCFS informed the court it continued to be unable to locate father, who had been released from jail on November 8, 2011.

DCFS's due diligence search for father remained pending on November 30, 2011. Notices sent to 10 of the 12 addresses identified had been returned undelivered; two responses remained outstanding.

At the November 30 adjudication hearing, the juvenile court found due diligence had not been completed on father, and held the allegations as to him in abeyance. The court sustained counts b-1 and b-2 as to mother. The court proceeded to disposition, declared the children juvenile court dependents, placed them in DCFS custody, and ordered reunification services for mother. The matter was continued to January 3, 2012 for DCFS to complete its due diligence.

DCFS's completed due diligence report was submitted on January 3, 2012; father's whereabouts remained unknown. The agency had received postal notifications as to 11 of 12 letters it sent to father, all of which indicated the letter had been unclaimed, the address was insufficient or the letter could not be delivered as addressed nor forwarded. DCFS had sent another letter, containing a copy of the petition, contact information for DCFS and notice of the January 3 hearing, to a twelfth address. No response had been received. Declarations signed by social workers detailed the sources reviewed in their unsuccessful efforts to find father.

At the adjudication hearing on January 3, 2012, the court found DCFS's due diligence efforts to find father complete, and sustained count b-3 as alleged. DCFS requested family reunification services be ordered for father. But, presumably, because father's whereabouts remained unknown, the court ordered unspecified "F.R. like" services for him.

DCFS's May 30, 2012 status review report for the 6-month review (§ 366.21, subd. (e)) review revealed that father had not visited D.K., had not maintained contact

with DCFS and that his whereabouts remained unknown.  The report does not identify any additional measures undertaken by DCFS to locate father.  DCFS recommended the court terminate "FR services" for father.  The juvenile court found that notice had been given to the parents as required by law.

The court extended mother's reunification services for 6-months, but noted its records "[didn't] show that [DCFS] ordered anything for [father]."  When counsel for the children and mother reminded the court it had previously ordered "FR like services" for father, the judge replied she "[didn't] have anything to determine that."  The juvenile court did not further address reunification services as to father.[3]  It found by clear and convincing evidence that DCFS had "complied with the case plan,"[4] and made reasonable efforts, including the necessary steps to finalize permanent placement for the children.  The matter was set for a 12-month review hearing (§ 366.21, subd. (f)).

In its December 19, 2012 report for the 12-month review, DCFS reported that D.K. had been in a stable placement with a maternal aunt since mid-August 2012.  The aunt was committed to adopting D.K. and a home study was pending.  Father's whereabouts were now known; he was incarcerated in Pleasant Valley State Prison in Coalinga.  An inmate locator search, conducted on an unspecified date, revealed that father had been incarcerated since April 27, 2012.  DCFS mailed notice of the December 19 hearing to father in prison on November 21, 2012.  The notice included DCFS's recommendation that no reunification services be offered to father.  DCFS recommended the court terminate mother's reunification services.  At the December 19 hearing, the court found that proper notice had been given to the parents, terminated mother's reunification services and ordered permanent placement services.  The court did not address the issue or termination of reunification services with respect to father.  The

---

[3] However, the minute order states that "DCFS is ordered to provide to . . . parents . . . :  Family Reunification Services."

[4] The record contains specific case plans for mother and for A.H.'s father, but none for father.

matter was continued for DCFS to notify the parties of the intent to set a section 366.26 hearing.

Following the hearing, the court received an undated handwritten letter from father in prison seeking an opportunity to reunify with D.K. The letter is date-stamped December 28, 2012. In the letter, father says he is aware that DCFS recommended that he receive no reunification services for D.K., but states that he wants to work toward reunification with D.K., wants to be a part of his son's life and wants visits with D.K. Father said he would attend parenting classes or do "whatever it takes," so that he could have visitation and asked to be present at the next review hearing. Father's letter was processed as a notice of appeal. (Cal. Rules of Court, rule 8.405(a)(3), (b).)[5]

## DISCUSSION

*1.    No duty to appoint counsel*

Father contends that once he was found to be D.K.'s presumed father, the juvenile court had a sua sponte obligation to appoint him counsel and that its failure to do so, absent a knowing and intelligent waiver, constitutes a violation of due process. He is mistaken.

Section 317 provides that counsel shall be appointed:

"(a)(1) When it appears to the court that a parent . . . desires counsel but is presently financially unable to afford . . . counsel, the court may appoint counsel as provided in this section. [¶] . . . [¶]

"(b) When it appears to the court that a parent . . . is presently financially unable to afford . . . counsel, and the child has been placed in out-of-home care, . . . the court shall

---

[5] Father raises an issue as to whether this appeal, rather than a writ (Cal. Rules of Court, rule 8.450), is the appropriate vehicle for review. It is. Where the juvenile court denies or terminates reunification services (which is effectively what occurred on December 19, 2012), but does not set a section 366.26 hearing, the order may be appealed immediately. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1178–1179.)

appoint counsel for the parent . . . , unless the court finds that the parent . . . has made a knowing and intelligent waiver of counsel . . . ."

In *In re Ebony W.* (1996) 47 Cal.App.4th 1643 (*Ebony W.*), the court rejected an argument similar to father's, and held that subdivisions (a) and (b) of section 317 must be read together. (*Id.* at p. 1647.) So construed, "the plain meaning of those provisions require some manifestation by the indigent parent that he or she wants representation before the court is obligated to appoint counsel." (*Ibid.*)

Here, father was aware of DCFS's involvement with his family as early as August 2011. He was informed of the importance of his attendance at the detention hearing in September 2011, but did not show up. Father was notified but did not appear at the December 19, 2012 hearing. Nor did he request that counsel be appointed for him, even though the notice prominently informed him he "**ha[d] the right . . . to be represented by an attorney," and that the "court [would] appoint an attorney for [him] if [he could not] afford one**." We agree with the reasoning in *Ebony W.*, *supra*, 47 Cal.App.4th 1643 that counsel is not to be appointed for an indigent parent unless he appears and asks that counsel be appointed or otherwise communicates that desire to the court. (*Id.* at pp. 1646–1648.)[6]

2.      *DCFS's ongoing duty to search for father*

In *In re J.H.* (2007) 158 Cal.App.4th 174 (*J.H.*), we summarized the law regarding notice in dependency actions:

---

[6] Neither authority on which father relies provides him a firmer foothold. *In re Meranda P.* (1997) 56 Cal.App.4th 1143, is factually distinct. That case involved a parent who appeared at the detention hearing, was advised of her right to counsel and willingly waived the right to representation. (*Id.* at p. 1147.) And the dictum on which father relies from *In re Jesse C.* (1999) 71 Cal.App.4th 1481, 1486, is just that. The issue in that case was when a court could relieve counsel for a child in a dependency proceeding. (*Ibid.*) In any event, father was explicitly advised of, but did not invoke, his right to representation. His letter is not a "de facto" request for appointed counsel.

"'Parents have a fundamental and compelling interest in the companionship, care, custody, and management of their children. [Citation.] "[T]he state also has an urgent interest in child welfare and shares the parent's interest in an accurate and just decision. [Citation.]" [Citation.] To ensure that result, "[u]ntil parental rights have been terminated, both parents must be given notice at each step of the proceedings. [Citations.]'" [Citation.]

"'At each hearing under section 300 et seq., the court must determine whether notice has been given as required by law and must make an appropriate finding noted in the minutes.' (Cal. Rules of Court, rule 5.534(k).)

"'Notice is both a constitutional and statutory imperative. In juvenile dependency proceedings, due process requires parents be given notice that is reasonably calculated to advise them an action is pending and afford them an opportunity to defend.' [Citation.] 'The child welfare agency must act with diligence to locate a missing parent. [Citation.] Reasonable diligence denotes a thorough, systematic investigation and an inquiry conducted in good faith. [Citation.] [¶] However, there is no due process violation when there has been a good faith attempt to provide notice to a parent who is transient and whose whereabouts are unknown for the majority of the proceedings. [Citations.]' [Citation.] Thus, where a parent cannot be located notwithstanding a reasonable search effort, the failure to give actual notice will not render the proceedings invalid. [Citation.]" (*J.H.*, at p. 182.)

Under section 361.5, a presumed father is entitled to reunification services unless "the court finds by clear and convincing evidence" that "the whereabouts of the parent . . . is unknown." (§ 361.5, subd. (b)(1); see also *In re E.O.* (2010) 182 Cal.App.4th 722, 726 [only a presumed father is entitled to reunification services and possible custody of child]; cf. *In re Zacharia D.* (1993) 6 Cal.4th 435, 451.) If reunification services are initially denied under section 361.5, subdivision (b)(1), "and the whereabouts of the parent become known within 6-months of the out-of-home placement of the child, the court shall order the social worker to provide family reunification services . . . ." (§ 361.5, subd. (d).)

Father concedes his whereabouts were unknown before the January 3, 2012 disposition hearing, and that DCFS's efforts to find him before that date were reasonable, "thorough, systematic and [made] in good faith." Father takes issue with DCFS's failure to act with due diligence to locate him after that date and before the 6-month review hearing in May 2012. He argues DCFS had an ongoing duty to search for him and, had it done so, would have found him prior to the May 30, 2012 6-month review hearing, at which he would have been awarded reunification services.[7]

Reduced to its essence, father's argument is: DCFS knew father had a history that included jail time and was a current user of illicit drugs.[8] It is a common knowledge that substance abusers often end up in jail. Father was in and out of jail in early November 2011 and it was foreseeable he would be incarcerated again. He was sent to state prison in late April 2012 and, before that, likely spent substantial time in jail. Thus, DCFS knew or should have known it was highly probable father would be re-incarcerated after November 2011 and, had DCFS regularly checked local jails, it most likely would have found him by May 2012. Father's argument is logically flawed. But we do agree that, on this record, it is clear that DCFS expended no effort to locate father before the 6-month review hearing, and little more before November 2012. Its failure to do so was deplorable but, in the end, harmless.

Father has not formally been denied reunification services; neither have such services actually been ordered or provided. As a presumed parent, father was entitled to reunification services absent a finding, by clear and convincing evidence, that a denial of services was warranted because his whereabouts were unknown. (§ 361.5, subds. (a),

---

[7] Despite the court's ambiguous order that father be given "F.R. like" services, the parties and we agree that, in actuality, father was consistently denied reunification services.

[8] In addition to the domestic violence issue, father's criminal history includes an arrest for check fraud and failure to pay for Metrolink tickets, a 2004 conviction for falsely reporting a bomb threat, for which he served 30 days in jail, and a trespass conviction in 2005, for which he served one day in jail and two years probation.

(b)(1).)  The juvenile court made no such finding.  Indeed, DCFS requested that the court award reunification services to father in January 2012, despite the fact that his whereabouts remained unknown and the court seemingly acquiesced.

"If the whereabouts of a parent are unknown, the issue becomes whether [reasonable or] due diligence was used to locate the parent."  (*In re Claudia S*. (2005) 131 Cal.App.4th 236, 247.)  "'The term "reasonable [or due] diligence" . . . "denotes a thorough, systematic investigation and inquiry conducted in good faith . . . ."'  [Citation.]"  (*In re Arlyne A*. (2000) 85 Cal.App.4th 591, 598.)  "'The means employed to give notice "must be such as one, desirous of actually informing the party, might reasonably adopt to accomplish it."'  [Citation.]"  (*Ibid*.) The record does not show that DCFS did anything to try to locate father between January and May 2012.  The social worker's report for the May 30, 2012 hearing states only that father failed to contact DCFS or to visit D.K. during the supervision period, and that "[r]equests for Due Diligence searches were submitted on 9/29/2011 for [father] [whose] whereabouts are unknown."  The report acknowledges that the court ordered "Family Like Reunification Services" for father in January 2012, but says nothing about any effort to provide such services.  The report concludes that, "because [father] has not attempted to contact [DCFS] nor shown an interest in visiting with his child," DCFS "believes it would be appropriate and reasonable to terminate FR services for father."

At the May 30 review hearing, the juvenile court did not inquire as to what, if any efforts DCFS had undertaken to locate father or to provide him services.  Indeed, even after it was reminded it had ordered "FR like" services for father, the court could not recollect having done so.  Nevertheless, it proceeded to find "by clear and convincing evidence the department has complied with the case plan by making reasonable efforts including whatever steps are necessary to make and finalize the permanent placement of these children . . . ."  The court did not specifically order reunification services terminated as to father, and its minute order states that DCFS was "ordered to provide . . . parents . . . :  Family Reunification Services."

The record does not specify the efforts DCFS undertook to find father after the 6-month review hearing. But, at some point before the action was about to move beyond the reunification period for any parent, DCFS became aware that father was in prison, and had been there since late April 2012.[9] DCFS thus allowed almost a full year to elapse without lifting a finger to find father. "Social service agencies, invested with a public trust and acting as temporary custodians of dependent minors, are bound by law to make every reasonable effort in attempting to inform parents of all hearings. They must leave no stone unturned." (*In re DeJohn B*. (2000) 84 Cal.App.4th 100, 102.) Efforts to notify a parent have been considered inadequate when a child services agency failed to use due diligence to determine the parent's whereabouts before termination of reunification services. (*Id*. at p. 108.)

"'Reasonable diligence denotes a thorough, systematic investigation and an inquiry conducted in good faith.' [Citation.]" (*J.H.*, *supra*, 158 Cal.App.4th at p. 182.) In dependency actions, due process requires notice "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" (*In re Melinda J*. (1991) 234 Cal.App.3d 1413, 1418, quoting *Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314 [70 S.Ct. 652, 94 L.Ed. 865]; accord, *In re Claudia S.*, *supra*, 131 Cal.App.4th at p. 247.) "The right to be heard '"has little reality or worth unless one is informed that the matter is pending . . . .'"'" (*County of Orange v. Carl D.* (1999) 76 Cal.App.4th at 429, 439.)

DCFS's reliance on *In re Raymond R*. (1994) 26 Cal.App.4th 436 to excuse its failure to continue its search for father is misplaced. The father in that case appeared at the detention hearing, was appointed counsel and was ordered to keep the social worker apprised of his address and phone number. (*Id*. at p. 439.) The father failed to attend any other hearings or to contact the social worker, and correspondence sent to the address he provided was returned. Under those circumstances, the court held: "Once a parent has

---

[9] There is no explanation as to how or when DCFS learned father was in prison.

12

been located, it becomes the obligation of the parent to communicate with the Department and participate in the reunification process." (*Id*. at p. 441.) Unlike *Raymond R*., father here did not receive notice[10] of the hearings or appointed counsel, and DCFS's only contact with father occurred before this action was initiated. While DCFS has not shown "a total absence of effort" in this case (*County of Orange v. Carl D*., *supra*, 76 Cal.App.4th at p. 439), its efforts to locate father after January 2012 surely cannot be deemed duly diligent.

3.  *No reversal required*

Even though DCFS failed its duty to continue looking for father, there is no prejudice. Errors in notice do not trigger automatic reversal. Reversal is not required if the error was harmless beyond a reasonable doubt. The California Constitution prohibits a court from setting aside an order or judgment unless the error caused a "miscarriage of justice." (Cal. Const., art. VI, § 13.) In dependency cases, our Supreme Court has "interpreted that language as permitting reversal only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error. (*In re Celine R*. (2003) 31 Cal.4th 45, 59–60.) The appellant bears the burden to show he was prejudiced by the order challenged. (*County of Los Angeles v. Nobel Ins. Co*. (2000) 84 Cal.App.4th 939, 945.)

The dependency petition here was filed in September 2011. The juvenile court held a 6-month review in May 2012 and a 12-month review, at which it turned to permanency planning arrangements, 15 months after the action was initiated, in December 2012. Father was incarcerated and unable to reunify with D.K. at the time of both hearings, and remained so at least up to the time his opening brief was filed in April

---

[10] Even though DCFS, in its October 6, 2011 report to the court, stated that its efforts to find father were pending and his whereabouts were unknown, the court apparently made a finding on October 6, 2011 that notice was proper. It is not disputed, however, that DCFS first successfully mailed notice to father in this action on November 21, 2012. That notice informed father of a pending December 19, 2012 hearing.

2013. Father has given no indication he will be released soon. If he is, and has made efforts at reunification, he may pursue his rights by filing a section 388 petition.[11]

The law sets strict limits on the length of time a very young child like D.K. must wait for his parent to become adequate in order to prevent the child from spending an inordinate amount of time in the uncertain limbo of foster care. Reunification services may be extended for up to 18 months if it is shown that the objectives of the service plan can be achieved within that extended time period. (§ 361.5, subd. (a)(3).) That reunification period is not tolled by a parent's absence or incarceration. (§ 361.5, subds. (d), (e)(1).) Here, the fact that father has been incarcerated for most of this proceeding, especially considered in light of D.K.'s young age and the fact that—except for a few weeks after the child's birth—the two have never known one another, strongly militates in favor of a conclusion that father cannot reunify with D.K. (*In re Marriage of Torr*es (1998) 62 Cal.App.4th 1367.)[12]

---

[11] When reunification services are denied, a parent may continue to work toward reunification on his own and file a section 388 petition if he or she makes substantial progress and there's a change of circumstances that would make reunification services in the child's best interest. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Meanwhile, father may request to be allowed to attend hearings and seek counsel. DCFS's contention that an incarcerated parent has no right to appear at review hearings is only partially correct. For any hearing other than adjudication, or a section 366.26 at which termination of parental rights is contemplated, the court has discretion to order an incarcerated parent's presence. (Pen. Code, § 2625, subd. (e); *In re Barry W.* (1993) 21 Cal.App.4th 358, 368–370.)

[12] The juvenile court must order reasonable services to a parent it knows is incarcerated unless it finds by clear and convincing evidence that services would be detrimental to the child. (§ 361.5, subd. (e).) In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the nature of the crime, the length of the sentence, the likelihood of the parent's discharge from incarceration within reunification time limits, the degree of detriment to the child in the absence of services and any other appropriate factors. (§ 361.5, subd. (e)(1); *In re James C.* (2002) 104 Cal.App.4th 470, 484–485.) The determination whether to offer services is made as to each parent individually. (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 59.)

A juvenile court may deny reunification services to an incarcerated parent if it finds that provision of services would be detrimental to the child. (§ 361.5, subd. (e)(1).) Unfortunately, it is often the case that the provision of reunification services to such a parent has little likelihood of success, and only serves to delay permanency and stability for the child, especially where, as here, the incarcerated parent would be the only one receiving services.[13] Success seems even less likely where, as here, an incarcerated parent remains so beyond the maximum time allotted for reunification services. To return this matter to the juvenile court to rectify DCFS's lack of diligence and to attempt to provide reunification services would seem to be no more than an unnecessarily dilatory strategy for failure. Accordingly, without sanctioning DCFS's apparent neglect of its duty to try to search for and notify the absent father, we find the court's failure to order reunification services harmless under the circumstances.

## DISPOSITION

The order terminating reunification services is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


MALLANO, P. J.


CHANEY, J.

---

[13] Mother's reunification services were terminated in December 2012. She has not appealed that ruling.